**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Civil Action No. 16-cv-1356-WJM-CBS

ERIC BRANDT,

      Plaintiff,

v.

THE CITY OF WESTMINSTER, COLORADO, municipality;
CHARLES RUSH, in his official and individual capacity;
RAY ESSLINGER, in his official and individual capacity;

      Defendants.

---

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

---

Now before the Court in this civil rights case are the parties' cross-motions for summary judgment, including Plaintiff's Motion for Summary Judgment (ECF No. 37) and Defendants' Combined Motion for Summary Judgment (ECF No. 39). As explained below, Defendants' Motion is granted in part, and Plaintiff's Motion is denied.

## I. LEGAL STANDARD

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Henderson v. Inter-Chem Coal Co., Inc.*, 41 F.3d 567, 569 (10th Cir. 1994). Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or conversely, is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49

(1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132 (10th Cir. 2000). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable jury could return a verdict for either party. *Anderson*, 477 U.S. at 248. In ruling on summary judgment, the Court must resolve factual ambiguities against the moving party, thus favoring the right to a trial. *Houston v. Nat'l Gen. Ins. Co.*, 817 F.2d 83, 85 (10th Cir. 1987).

## II. BACKGROUND

The following facts are undisputed unless attributed otherwise.

On the morning June 6, 2014, Plaintiff Eric Brandt ("Brandt") was walking along sidewalks in Westminster, Colorado, displaying a sign which he describes as "a gigantic Styrofoam middle finger emblazoned with the letters 'Fuck cops.'" (ECF No. 37 at 7 ¶¶ 32–34; ECF No. 47 at 6–7, ¶¶ 32–34; ECF No. 37-5 at 4–5.)[1] This behavior was in keeping with Brandt's conduct on numerous other occasions; as pled in Brandt's Complaint, "wherever Mr. Brandt goes in Westminster, he carries a very large, handmade sign that reads 'Fuck Cops.'" (ECF No. 1 ¶ 12.) According to Brandt, he does this to protest police misconduct, and particularly misconduct by the Westminster Police Department ("WPD").

On the morning in question, for approximately 30 minutes after leaving his apartment, Brandt was, in his words, "engaging the public" with his sign. (ECF No. 37-5

---

[1] All citations to docketed materials are to the page number in the CM/ECF header, which may differ from a document's internal pagination, as with docketed excerpts of deposition transcripts.

at 4, 13.) Some members of the public, however, were less than thrilled. According to WPD records, at least three separate callers reported Mr. Brandt to the police. As reflected in WPD's report (ECF No. 37-3) and in the audio recording of calls to WPD and WPD dispatch communications (*see* ECF Nos. 38, 40, 37-4), several civilians reported Brandt's sign and conduct as "offensive," "disgusting," and in similar terms.

The lead investigating officer responsible for taking statements from these complaining witnesses was non-party Officer William Carnes. (ECF No. 39 at 5, ¶ 10.) Based on the calls and complaints received, WPD dispatched Sergeant Raymond Esslinger and Officer Charles Rush, both Defendants here. Sergeant Esslinger, who knew Brandt from prior interactions, first contacted Brandt at the intersection of 76th Avenue and Sheridan Boulevard at approximately 8:38 a.m., and Officer Rush arrived a few minutes later. (*See* ECF No. 37-3 at 7.)

While Sergeant Esslinger and Officer Rush were speaking with Brandt, Officer Carnes took statements from the complaining witnesses. (ECF No. 39 at 5, ¶ 10; ECF No. 43 at 5, ¶ 10.) After he "learned through Officer Carnes that probable cause for the charge of Disorderly Conduct existed" (ECF No. 37-3), Officer Rush served Brandt with a citation for disorderly conduct in violation of Westminster Municipal Code § 6-2-1(A)(1). (*See id.*) Brandt protested being arrested and taken into custody, and requested that he instead be issued a summons to later appear. (*See* ECF No. 37-5 at 14.) Esslinger and Rush agreed to this, after which, Brandt, in his own words, "boldly carried [his] sign down the street to [his] house." (*Id.* at 16.) In total, Brandt's interaction with Esslinger and Rush lasted approximately thirty minutes. (ECF No. 37 at

3, ¶ 1; ECF No. 47 at 3, ¶ 1.)[2]  The disorderly conduct charge against Brandt was eventually dismissed.  (ECF No. 39 at 6, ¶ 19; ECF No. ECF No. 37-5 at 17.)

### III. ANALYSIS

Brandt brings six claims against Defendants:

(I) a claim brought under 42 U.S.C. § 1983 for violation of his First Amendment right to free speech;

(II) a § 1983 claim for retaliation against Brandt for exercise of his First Amendment rights;

(III) a facial challenge that Section 6-2-1(A)(1) is unconstitutionally overbroad in violation of the First Amendment;

(IV) a facial challenge that Section 6-2-1(A)(1) is unconstitutionally void for vagueness, under the Fourteenth Amendment;

(V) a § 1983 claim for violation of Brandt's Fourth Amendment rights by way of an unlawful search and/or seizure; and,

(VI) a § 1983 claim for malicious prosecution in violation of the Fourteenth Amendment.

(ECF No. 1 ¶¶ 42–93.)

Defendants move for summary judgment against all of these claims, while Brandt affirmatively moves for summary judgment in his favor on his first, third, and fourth

---

[2] Both sides use the word "detained" to describe the period of time when Brandt was in contact with Sergeant Esslinger and Officer Rush, but dispute precisely how long this lasted—characterizing it as "over thirty minutes," "approximately 30 minutes, maybe," or "no longer than thirty minutes."  (*See* ECF No. 37 at 3, ¶ 1; ECF No. 47 at 3, ¶ 1.)  The Court finds this dispute immaterial to any issue analyzed below.

claims (*i.e.*, his facial and as-applied First Amendment claims, but not his claims for retaliation, violation of his Fourth Amendment rights, or malicious prosecution.)  The Court addresses each of these claims in turn, but in a different sequence than as pled, given the interrelated analysis of the issues raised.

## A.    Brandt's Facial Challenges to Section 6-2-1(A)(1)

Brandt argues that Section 6-2-1(A)(1) is unconstitutional both because it is overbroad in violation of the First Amendment and void for vagueness in violation of the Fourteenth Amendment.  The parties filed cross-motions for summary judgment on these claims, each side arguing it is entitled to judgment as a matter of law.

### 1.    Standing

The Supreme Court has long recognized that a criminal defendant may bring a facial challenge against statute or ordinance under which he or she is charged, even if the statute would not be invalid as applied to his or her own conduct.  *See Gooding v. Wilson*, 405 U.S. 518 520–22 (1972) ("Although a statute may be neither vague, overbroad, nor otherwise invalid as applied to the conduct charged against a particular defendant, he is permitted to raise its vagueness or unconstitutional overbreadth as applied to others * * * since the otherwise continued existence of the statute in unnarrowed form would tend to suppress constitutionally protected rights." (quoting *Coates v. City of Cincinnati*, 402 U.S. 622, 619–20 (White, J., dissenting)); *see also Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003) ("the significance of First Amendment rights" ... "justif[ies] a lessening of prudential limitations on standing.  The mere threat of prosecution . . . may have a 'chilling' effect").

Likewise, a person charged with a speech-related crime may bring a § 1983 claim, even after criminal charges are dismissed.  *See Ward*, 321 F.3d at 1264.

> In the First Amendment context, two types of injuries may confer Article III standing to seek prospective relief.  First, a plaintiff generally has standing if he or she alleges an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by statute, and there exists a credible threat of prosecution thereunder. Plaintiffs may have standing even if they have never been prosecuted or actively threatened with prosecution.  Second, although allegations of a 'subjective' chill are not adequate, a First Amendment plaintiff who faces a credible threat of future prosecution suffers from an ongoing injury resulting from the statute's chilling effect on his desire to exercise his First Amendment rights.

*Id.* at 1267 (internal quotation marks and citations omitted).

On the facts and record here, the Court is satisfied that Brandt has a demonstrated intention to engage in future speech or conduct essentially identical to that for which he was charged here, that he faces a credible threat of future prosecution for such conduct, that this threat is "real and immediate" for standing purposes, and that Brandt has sufficiently demonstrated "continuing, present adverse effects in the form of the chilling of his First Amendment rights."  *See id.* at 1269.

2.    Overbreadth

a.    *Legal Framework*

"The First Amendment provides that 'Congress shall make no law . . . abridging the freedom of speech.'"  *United States v. Stevens*, 559 U.S. 460, 468 (2010).  Thus, "[a]s a general matter . . . [the] government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Id.* (internal quotation marks

omitted).  Because Section 6-2-1(A)(1) of the Westminster Municipal Code regulates speech based on content, the Court starts by viewing that restriction as "presumptively invalid," and Defendants bear the burden of rebutting that presumption.  *Stevens*, 559 U.S. at 468 (citing *United States v. Playboy Enter. Grp., Inc.*, 529 U.S. 803, 817 (2000)).

However, the First Amendment does "permi[t] restrictions upon the content of speech in a few limited areas," which the Supreme Court has described as "historic and traditional categories."  *Stevens*, 559 U.S. at 468.  These include regulation of obscenity, defamation, fraud, incitement, and "speech integral to criminal conduct."  *Id.* The Supreme Court has described these as "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."  *Id.* (quoting *Chaplinsky v. N.H.*, 315 U.S. 568, 571–72 (1942)).  As most relevant here, the First Amendment does not prohibit the restriction or criminalization of "'fighting words'—those words which by their very utterance inflict injury or tend to incite an immediate breach of the peace.  *Chaplinsky*, 315 U.S. at 572.

When statutes or ordinance seek to regulate speech within these permitted areas, the restrictions "must be carefully drawn or be authoritatively construed to punish only unprotected speech and not be susceptible of application to protected expression. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity."  *Gooding*, 405 U.S. at 523 (internal quotation marks omitted); *id.* at 528 (statutes ostensibly criminalizing only "fighting words" must "define the standard of responsibility with requisite narrow specificity").

7

Accordingly, "[i]n the First Amendment context . . . a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Stevens*, 559 U.S. at 473.

To prevail on an overbreadth challenge, a plaintiff must "show that the potential chilling effect on protected expression is 'both real and substantial.'" *United States v. Brune*, 767 F.3d 1009, 1018 (10th Cir. 2014) (quoting *Erznozik v. City of Jacksonville,* 422 U.S. 205, 216 (1975)). "Finding *some* overbreadth only satisfies part of the inquiry, as the challenger must also show that the law punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.'" *Id.* (emphasis in original; internal quotation to *Broadrick v. Okla.*, 413 U.S. 601, 615 (1973) and other internal quotation marks omitted). "The Supreme Court has 'vigorously enforced the requirement that a statute's overbreadth be *substantial* in both absolute and relative terms." *Brune*, 767 F.3d at 1018 (emphasis in original; quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)).

Thus, "even where a fair amount of constitutional speech is implicated, [the Court] will not invalidate the statute unless significant imbalance exists[.]" *Brune*, 767 F.3d at 1018 (emphasis in original; internal quotation marks omitted). This analysis recognizes "legitimate interests in maintaining comprehensive controls over harmful constitutionally unprotected conduct" and the "social costs created by the overbreadth doctrine when it blocks application of a law to constitutionally unprotected speech." *Id.* (quoting *Virginia v. Hicks*, 539 U.S. 113, 119 (2003); alterations incorporated). Generally speaking, facial challenges have been described as "disfavored," as "strong

medicine" to be "employed sparingly and only as a last resort," and "best when infrequent." *Brune*, 767 F.3d at 1019 (internal quotation marks omitted).[3]

      b.    *Limiting Construction & Application of Section 6-2-1(A)(1)*

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." *Williams*, 553 U.S. at 293. Where a state statute—or, as here, a municipal ordinance—is challenged, "[o]nly the [state] courts can supply the requisite construction," since the federal courts "lack jurisdiction authoritatively to construe state legislation." *Gooding*, 405 U.S. at 521; *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981) (state courts' construction of municipal code is controlling when determining if First Amendment is implicated).

Section 6-2-1(A)(1) of the Westminster Municipal Code ("Section 6-2-1(A)(1)" or "the Ordinance") prohibits disorderly conduct:

> (A) It shall be unlawful for any person to commit disorderly conduct. A person commits disorderly conduct if he intentionally, knowingly or recklessly:
>
> (1) Makes a coarse and obviously offensive utterance, gesture or display in a public place, and the utterance, gesture or display tends to incite an immediate breach of the peace, whether or not an actual breach of the peace takes place;

This language is nearly identical to Colorado Revised Statutes § 18-9-106(1)(a),

---

[3] *But see generally*, Richard H. Fallon Jr., *Fact and Fiction About Facial Challenges*, 99 Cal. L. Rev. 915, 917–18 (2011) (noting that as an empirical matter at the Supreme Court "facial challenges to statutes are common, not anomalous," and "also succeed much more frequently than either Supreme Court Justices or most scholarly commentators have recognized").

which also prohibits "a coarse and obviously offensive utterance, gesture or display" that "tends to incite an immediate breach of the peace:

> (1) A person commits disorderly conduct if he or she intentionally, knowingly, or recklessly:
>
> (a) Makes a coarse and obviously offensive utterance, gesture, or display in a public place and the utterance, gesture, or display tends to incite an immediate breach of the peace[.]

Colo. Rev. Stat. § 18-9-106 (2018).  Thus, only the final clause included in Section 6-2-1(A)(1)—clarifying that it applies "whether or not an actual breach of the peace takes place"—distinguishes it from the otherwise identical language of § 18-9-106(1)(a).

In *People v. Hansen*, 548 P.2d 1280 (Colo. 1976), the Colorado Supreme Court held that a prior version of the state disorderly conduct statute (then codified as Colo. Rev. Stat. § 40-9-106 (1971)) was unconstitutionally overbroad.  That version of the statute, like the current version, prohibited making "a coarse and obviously offensive utterance, gesture, or display," but *lacked* the limiting language now included in both § 18-9-106(1)(a) and Section 6-2-1(A)(1), making them applicable only to conduct that "tends to incite an immediate breach of the peace."  *See id.* at 1280.  Reviewing legislative history, the *Hansen* court noted that this limiting language had been included in proposed legislation originating with a Texas proposal that explicitly sought to limit the statutory prohibition to "fighting words," in response to *Chaplinksy*.  However, when the Colorado provision was adopted it omitted the limitation to speech that "tends to incite an immediate breach of the peace."  *See id.* at 1282.  Lacking this limiting clause, *Hansen* struck down the Colorado statute as overbroad.

"After *Hansen* was decided, the [Colorado] General Assembly amended section 18-9-106(1)(a) . . . by expressly including a 'fighting words' limitation." *Aguilar v. People*, 886 P.2d 725, 729 & n.10 (Colo. 1994); *see also People v. Smith*, 862 P.2d 939, 942 n.6 (discussing *Hansen* and 1981 Colo. Sess. Laws 1010). Thus, the authoritative Colorado state court interpretations of § 18-9-106(1)(a) make clear that the "immediate breach of the peace" limiting clause which is now found in both § 18-9-106(A)(1) and Section 106-1-6(A)(1) was explicitly meant to limit liability to "fighting words." Although the Colorado Supreme Court has not directly held that the current version of § 18-9-106(1)(a) or the parallel Westminster Ordinance not to be overbroad, there seems little need, since that court has already held that the language added after *Hansen* constitutes "a 'fighting words' limitation," explaining that "[t]he narrow scope of the 'fighting words ' exception added to section 18-9-106(1)(a) illustrates the specific concern of the General Assembly in remedying the statute," and that authoritative Colorado interpretations view the "immediate breach of the peace" limitation as restricting the statute's application only to "fighting words." *Aguilar*, 886 P.2d at 729; *In re R.C.*, ___ P.3d ___, ¶ 11, 2016 WL 6803065 (Colo. App. Nov. 17, 2016), *cert. denied,* 2017 WL 5664821 (Colo. Nov. 20, 2017) ("[§ 18-9-106(1)(a)] is narrowly drawn to ban only 'fighting words'" (citing *Hansen*)).[4]

---

[4] In addition, since *Hansen*, the Colorado Supreme Court has used limiting constructions to construe related provisions as limited to "fighting words." *See People ex rel. VanMeveren v. Cnty. Court In & For Larimer Cnty.*, 551 P.2d 716, 719 (1976) (reading state harassment statute, Colo. Rev. Stat. § 18-9-111(1)(e), as "proscrib[ing] only those words which have a direct tendency to cause acts of violence by the persons to whom, individually, the words are addressed. * * * The limited scope of the statute brings it within permissible limitations on free expression." (citing *Chaplinsky*)).

And, in its own overbreadth cases, the Colorado Supreme Court has emphasized that "[i]f possible, we should employ a limiting construction that preserves the constitutionality of the statute and is not contrary to legislative intent." *Aguilar*, 886 P.2d at 728. Thus, the Court finds it clear that under an authoritative limiting construction, the language of § 18-9-106(1)(a) applies only to "fighting words." The question then becomes whether the same limiting construction applies equally to Section § 6-2-106(1)(a). Since the Westminster ordinance directly mirrors the state statute, using identical language, the Court sees no reason why the limiting construction explicitly applied to § 18-9-106(1)(a) does not also apply to Westminster's Section 6-2-106(A)(1), thus protecting against any municipal prosecutions that reach beyond the "fighting words" limitation, and saving the ordinance from overbreadth.

Although Brandt protests that Defendants cite "no authority for the proposition that state court decisions interpreting other ordinances and statutes should give a separate and distinct ordinance a limiting construction" (ECF No. 50 at 11), the Court rejects the view that Section 6-2-1(A)(1) is a prohibition that is materially "separate and distinct" from § 18-9-106(1)(a). Logic, judicial economy, and established principles of statutory interpretation and state-municipal relationships all dictate that the limiting construction which prevents § 18-9-106(1)(a) from being overbroad is equally applicable to Section 6-2-1(A)(1). *See generally Kinder Morgan CO2 Co., L.P. v. Montezuma Cnty. Bd. of Commissioners*, 396 P.3d 657, 664 (Colo. 2017) ("We construe statutes related to the same subject matter alongside one another, with the goal of giving consistent, harmonious, and sensible effect to all of their parts."); *Roalstad v. City of Lafayette,* 363 P.3d 790, 792 (Colo. 2015) ("Courts interpret local government

12

ordinances as they would any other form of legislation"); *cf. City of Greenwood Vill. on Behalf of State v. Fleming*, 643 P.2d 511, 516 (Colo. 1982) ("The violation of an ordinance which is the counterpart of a criminal statute should be tried and punished under the protections applicable to criminal cases even though prosecuted in a municipal court." (internal quotation marks omitted)).  It certainly cannot be the case that if 100 Colorado municipalities each adopted ordinances which in all material respects mirror § 18-9-106(1)(a) that the Colorado Supreme Court would then need to resolve in 100 separate actions 100 identical claims of overbreadth before the statutory and limiting constructions would apply to the identical language of every one of those ordinances.

Lastly, Brandt also points out that Section 6-2-1(A)(1) is not entirely identical to § 18-9-106(1)(A), because the Ordinance includes an additional phrase indicating that Section 6-2-1(A)(1) applies "whether or not an actual breach of the peace takes place." (*See* ECF No. 50 at 12.)  Brandt argues this clause "expands" the Ordinance's scope to regulate protected speech, and that the limitation to speech which "tends to incite an immediate breach of the peace" is in turn nullified by the caveat, "whether or not an actual breach . . . takes place."  (ECF No. 50 at 14–15.)  The Court disagrees.  The Court reads the final "whether or not" clause of Section 6-2-1(A)(1) as at most clarifying the application of the preceding clauses, but not expanding their substantive scope. The Court is unaware of any authority making the First Amendment "fighting words" doctrine dependent on an *actual* breach of the peace, or requiring authorities to wait until actual violence erupts before they may restrict speech that is otherwise permissibly regulated under *Chaplinsky*.  The relevant test is not whether a breach of the peace has

13

*actually* occurred, but "whether the speech was inherently *likely* to cause a violent reaction." *See Klen v. City of Loveland, Colo.*, 661 F.3d 498, 510 (10th Cir. 2011) (emphasis added); *see also, e.g., VanMeveren*, 551 P.2d at 719 ("The test is what [persons] of common intelligence would understand to be words *likely* to cause an average addressee to fight." (emphasis added; citing *Chaplinsky*, 315 U.S. at 573). Moreover, if a limited reading of the Ordinance will preserve its constitutionality, the courts will adopt that more restrictive interpretation. *Aguilar*, 886 P.2d at 728. The Court therefore does not read the final clause of Section 6-2-1(A)(1) either as rendering the authoritative limiting construction inapplicable, or as permitting the Ordinance to be enforced against expression that falls beyond the limited scope of the "fighting words" standard long-established under *Chaplinsky* and its progeny.

* * *

In sum, because the Colorado courts have adopted an authoritative limiting construction which the Court finds applicable to Section 6-2-1(A)(1), limiting its application only to "fighting words," the Court rejects Brandt's overbreadth challenge to the Ordinance and grants Defendants' motion for summary judgment against this claim.

2. Vagueness

Brandt also claims Section 6-2-1(A)(1) is unconstitutionally void for vagueness, in violation of the due process protections of the Fourteenth Amendment. (ECF No. 1 ¶¶ 74–78; ECF No. 37 at 19–22.)

"[T]he void-for-vagueness doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *Skilling v. United States*, 561 U.S. 358,

412 (2010). Thus, "[v]agueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *City of Chicago v. Morales*, 527 U.S. 41, 56 (1999); *Jordan v. Pugh*, 425 F.3d 820, 824–25 (10th Cir. 2005). Therefore, "[t]o comport with . . . Due Process . . . a law must 'give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute,'" and "[t]his notice must be given 'in a manner that does not encourage arbitrary and discriminatory enforcement.'" *United States v. Richter*, 796 F.3d 1173, 1188–89 (10th Cir. 2015) (quoting *United States v. Lovern*, 590 F.3d 1095, 1103 (10th Cir. 2009) and *Skilling*, 561 U.S. at 402–03)).

Brandt argues the Ordinance "is vague, not in the sense that it requires a person to conform his conduct to an imprecise but comprehensible normative standard, but rather in the sense that no standard of conduct is specified at all." (ECF No. 37 at 21 (citing *Coates v. City of Cincinnati*, 402 U.S. 611, 614 (1971)).) Brandt also argues the provision "give[s] way to arbitrary and discriminatory enforcement," relying on officers' subjective views of what constitutes 'coarse' or 'offensive'" speech or conduct, thus running afoul the due process concern with arbitrary and discriminatory enforcement, recognized in *Grayned v. City of Rockford*, 408 U.S. 104, 109–10 (1972), *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964), and elsewhere. (*See* ECF No 37 at 21.)

As explained above, however, authoritative Colorado authority construes the language of the Ordinance to prohibit only "fighting words," limiting its application only

to conduct which may be constitutionally regulated. "[T]he Supreme Court 'has routinely rejected, in a variety of contexts, vagueness claims where a clarifying construction rendered an otherwise enigmatic provision clear as applied to the challenger.'" *United States v. Miller*, 868 F.3d 1182, 1188 (10th Cir. 2017) (quoting *Beckles v. United States*, 137 S. Ct. 886, 897 (Ginsburg, J., concurring)). "This is so because a narrowing construction of an otherwise vague statute provides a person of ordinary intelligence fair notice of what is prohibited." *Miller*, 868 F.3d at 1188–89 (internal quotation marks omitted; alterations incorporated). As with Brandt's overbreadth claim, because an authoritative limiting construction clarifies that Section 6-2-1(A)(1) applies only to "fighting words," Brandt's vagueness claim must also fail.

Moreover, while Brandt argues the Ordinance is impermissibly vague, *Chaplinsky* and decades of subsequent cases give no indication that a restriction limited to "fighting words" is impermissibly vague. While Brandt quotes general statements regarding the importance of clear notice and guarding against arbitrary enforcement, equally-controlling general statements recognize that "[i]mpossible standards of specificity are not required," *Jordan v. DeGeorge*, 341 U.S. 223, 231 (1951), that "we can never expect mathematical certainty," *Grayned*, 408 U.S. at 110, and that "a regulation is not vague because it may at times be difficult to prove an incriminating fact but rather because it is unclear as to what fact must be proved," *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

Absent a more developed argument as to *how* Section 6-2-1(A)(1) is impermissibly vague, and with no citation to any authority striking down for vagueness a

statutory provision with a "fighting words" restriction, Brandt has not persuaded the

Court that Section 6-2-1(A)(1) is facially invalid.  *See Jordan*, 425 F.3d at 828 ("To

mount a facial vagueness challenge, the litigant must show that the potential chilling

effect on protected expression is both real and substantial.").  To the extent Brandt

relies on the argument that the instant prosecution against him demonstrates that the

Ordinance is susceptible to targeted or arbitrary enforcement, Defendants' respond that

their citation of Brandt was justified, making this a fact-bound claim not supporting a

facial challenge, and for which Brandt's remedy lies with his First Amendment retaliation

claim.

In sum, given an authoritative limiting construction that cabins the Ordinance's

application to "fighting words," and the lack of any legal authority suggesting that such a

"fighting words" prohibition is unconstitutionally vague, Brandt's facial vagueness

challenge to Section 6-2-1(A)(1) is rejected.

**B.      Individual Liability of Esslinger and Rush**

1.      Qualified Immunity

Defendants Esslinger and Rush assert they are entitled to qualified immunity,

"which shields public officials from damages actions unless their conduct was

unreasonable in light of clearly established law."  *Knopf v. Williams*, ___ F. 3d ___, ___,

2018 WL 1178346, at *3 (10th Cir. Mar. 5, 2018) (quoting *Estate of Booker v. Gomez*,

745 F.3d 405, 411 (10th Cir. 2014)).

"Once an individual defendant asserts qualified immunity, the plaintiff carries a

two-part burden to show: (1) that the defendant's actions violated a federal

constitutional or statutory right, and, if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Knopf*, 2018 WL 1178346, at *3 (quoting *Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (quotations omitted)). "If the plaintiff fails to satisfy either part of the inquiry, the court must grant qualified immunity." *Id.* (quoting *Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1208 (10th Cir. 2017)).

"A plaintiff may show clearly established law by pointing to either a Supreme Court or Tenth Circuit decision, or the weight of authority from other courts, existing at the time of the alleged violation." *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017). To be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *White v. Pauly*, 137 S.Ct. 548, 551 (2017). "Although there need not be a 'case directly on point,' an officer 'cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it." *Knopf*, 2018 WL 1178346, at *3 (quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015), *City & Cnty. of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1774 (2015), and *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014)); other alterations incorporated).

The Court must not define "clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Rather, "the clearly established law must be particularized to the facts of the case." *White*, 137 S.Ct. at 552 (internal quotation marks omitted). "The dispositive question is whether the violative nature of particular conduct is clearly established." *Mullenix*, 136 S.Ct. at 308. Therefore a plaintiff may not defeat qualified immunity "simply by alleging violation of extremely abstract rights."

*White*, 137 S.Ct. at 552.[5]  Nonetheless, the clearly established inquiry

> involves more than a scavenger hunt for prior cases with
> precisely the same facts.  The more obviously egregious the
> conduct in light of prevailing constitutional principles, the
> less specificity is required from prior case law to clearly
> establish the violation.

*Perea v. Baca,* 817 F.3d 1198, 1204 (10th Cir. 2016) (internal quotation marks and

citations omitted).

    2.    <u>Fellow Officer Rule</u>

    In addition to more general qualified immunity arguments, Esslinger and Rush

assert they are entitled to immunity under the fellow officer rule.  This "'good faith'

defense shields objectively reasonable good faith reliance on the statements of a fellow

officer."  *Felders ex rel. Smedly v. Malcom*, 755 F.3d 870, 882 (10th Cir. 2014).  "Police

officers are entitled to rely upon information relayed to them by other officers in

determining whether there is reasonable suspicion to justify an investigative detention

or probable cause to arrest."  *Oliver v. Woods*, 209 F.3d 1179, 1190 (10th Cir. 2000).

    The Supreme Court has explained that "[e]ffective law enforcement cannot be

conducted unless police officers can act on directions and information transmitted by

one officer to another and . . . officers . . . cannot be expected to cross-examine their

fellow officers about the foundation for the transmitted information."  *Id.* (quoting *United*

---

[5] The *denial* of qualified immunity at the summary judgment phase *may* give rise to interlocutory appellate jurisdiction, "but only to the extent the appeal involves abstract issues of law."  *Ralston v. Cannon* ___ F. 3d. ___, ___, 2018 WL 1279738, at *4 (10th Cir. March 13, 2018).  Such appeals, however, do not permit "second-guessing the district court's determinations of evidence sufficiency[.]"  *Id.* at *5.  Thus, where the application *vel non* of qualified immunity is tied to one or more factual disputes, as is certainly the case here, it does not give rise to such a permissible interlocutory appeal.  *Id.*

*States v. Hensley*, 469 U.S. 221, 231 (1985)).  Therefore an "officer who acts in reliance on what proves to be the flawed conclusions of a fellow police officer may nonetheless be entitled to qualified immunity as long as the officer's reliance was objectively reasonable."  *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1260 (10th Cir. 1998).

However, the fellow officer rule "does not protect deliberate, reckless, or grossly negligent reliance on the flawed conclusions of a fellow officer," *Felders*, 755 F.3d at 882, and another officer's "erroneous probable cause determination" will not "transform [an] unreasonable belief that probable cause existed . . . into a reasonable belief," *Stearns v. Clarkson*, 615 F.3d 1278, 1285 (10th Cir. 2010).  One officer's reliance on information provided by another "must be objectively reasonable."  *Baptise*, 147 F.3d at 1260.

Here, even viewed in the light most favorable to Brandt, the evidence insufficient for Brand to show that Esslinger and Rush acted recklessly, negligently, or unreasonably in relying on Officer Carnes's probable cause determination.  The uncontroverted evidence establishes that Esslinger and Rush responded to a dispatch call which had reported to them an unknown man allegedly yelling and/or cursing at passersby, without identifying the suspect as Brandt, and without mentioning his sign.  Brandt does not claim, and could not prove, that Esslinger or Rush were retaliating against him for his speech, or otherwise violated his rights simply by responding to the dispatch call and making initial contact with him.  (*See* ECF No. 43 at 14–22.)  Moreover, as further analyzed below, the evidence cannot establish an unreasonable

search or seizure in violation of Brandt's Fourth Amendment rights based on his temporary detention for an investigatory stop while Officer Carnes took statements to determine if Brandt had violated any law. *See infra*, part III.C.2. Therefore the only act taken by Esslinger and/or Rush which arguably could have violated Brandt's rights was issuing him the citation and serving him with a summons.

The record establishes, however, that when Officer Rush completed and served the citation on Brandt, he did so exclusively in reliance on Officer Carnes's offsite determination that probable cause existed to cite Brandt for disorderly conduct under Section 6-2-1(A)(1). (ECF No. 37-1 at 3–4, 8.) Other than confirming which sub-part of the disorderly conduct Ordinance to indicate on the citation, Officer Rush did not inquire into the basis for Officer Carnes's determination of probable cause. (*Id.* at 4, 8.) Nor was he required to do so. *See Oliver*, 209 F.3d at 1190 (officers are not "expected to cross-examine their fellow officers"); *cf. Baptiste*, 147 F.3d at 1260 ("An officer who is called to the scene . . . is not required to reevaluate the arresting officer's probable cause determination in order to protect herself from personal liability.").

Brandt argues that Esslinger and Rush should not have "blindly" relied upon and followed Officer Carnes's probable cause determination. He argues that Rush, and particularly Esslinger, as the supervising officer on scene, who held a higher rank than Officer Carnes, were independently "responsible for ensuring that Mr. Brandt's arrest was both supported by probable cause and complied with the Constitution." (ECF No. 50 at 2.) This argument is unsupported by legal authority and contrary to the fellow officer rule, and Plaintiff's citation to distinguishable cases in which the involved officers knew or should have known their conduct was unconstitutional does not saddle Rush

and Esslinger with a duty to second-guess a clear statement of probable cause relayed by another officer.

Moreover, Brandt has not cited to evidence in the record from which a reasonable jury could conclude that it was objectively unreasonable for Esslinger and Rush to rely on Officer Carnes's determination of probable cause. To the contrary, the record is clear that Officer Rush "learned through Officer Carnes the probable cause for the charge of Disorderly Conduct existed" (ECF No. 37-3), that Officer Rush "didn't know the full basis of Officer Carnes' [*sic*] investigation," but knew that "it was alleged that Mr. Brandt was yelling at passing vehicles" or at passersby, that Officer Carnes "had several witnesses . . . willing to testify" (ECF No. 37-1 at 3), and that Officer Rush "issued [Brandt] a summons on [Officer Carnes's] behalf" (*id.* at 4). Sergeant Esslinger, who evidently did not speak with Officer Carnes himself, was "engaged in a lengthy conversation with [Brandt] while Rush and Carnes spoke," but was informed, "[f]rom Officer Rush, all he told me is, I have probable cause to issue him a ticket." (ECF No. 37-2 at 5.) Sergeant Esslinger also testified to the effect that it is standard procedure for WPD to "go off of the investigating officer," and that he trusted Officer Carnes (ECF No. 37-2 at 5), while Officer Rush testified that "[i]t's not uncommon . . . to act on the probable cause other officers generate" (ECF No. 37-1 at 8), and that WPD "often" or "typically" operates by having one officer investigate and other officers rely on that officer's determination of probable cause (*id.*). All of these facts tend to establish that Rush and Esslinger acted reasonably when they relied on Carnes, and Brandt has no factual argument or evidence to show otherwise.

Brandt objects that Esslinger and Rush are not entitled to immunity "[f]irst and

foremost" because probable cause did not, in fact, exist to "arrest and cite Mr. Brandt" for disorderly conduct. (ECF No. 50 at 6.) But even assuming Brandt is correct that Carnes's probable cause determination was flawed, that is exactly the situation in which the fellow officer rule shields Esslinger and Rush from liability. *Baptiste,* 147 F.3d at 1260. It is simply not the case that because Esslinger and Rush did not observe Brandt breaking any law after they arrived, that they were obligated to second-guess whether he had done so before, as Carnes determined he likely had, based on speaking to witnesses not at the scene and unknown to Esslinger and Rush. Likewise, while Brandt cites to the WPD case report and dispatch records to argue that there was never probable cause, or indeed any report of unlawful conduct (as opposed to citizens complaining Brandt's conduct was "offensive" or "disgusting"), those records were not in Esslinger and Rush's possession at the time Brandt was cited, and their content was not known to them. The Court cannot hold that Rush and Esslinger were obligated to second-guess Carnes's police work based on facts unknown to them at the time, and on the statements of witnesses with whom they did not communicate.

Since there is no genuine dispute that Esslinger and Rush did not know the facts that led to Officer Carnes's probable cause determination, and Brandt has no evidence from which a reasonable jury could find that it was objectively unreasonable for them to rely on Officer Carnes in this circumstance, there was no reason why a "reasonable official in [their] shoes would have understood that he was violating" Brandt's rights. *See Knopf*, 2018 WL 1178346, at *3. Accordingly, under the fellow officer rule, Sergeant Esslinger and Officer Rush are entitled to qualified immunity against all of Brandt's § 1983 claims.

**C.    Claims Against Westminster**

1.    <u>Municipal Liability</u>

Although the Court will grant summary judgment as to all of Brandt's claims brought against Esslinger and Rush individually based on qualified immunity, the City of Westminster may still be held liable for Brandt's § 1983 claims.  Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality can be liable under 42 U.S.C. § 1983 for damages only when the entity's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [constitutional] injury."  436 U.S. at 694.  "A plaintiff suing a municipality under Section 1983 for the acts of one of its employees must prove: (1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Cavanaugh v. Woods Cross City*, 625 F.3d 661, 667 (10th Cir. 2010) (internal quotation marks omitted).

If Plaintiff establishes these elements, then Westminster may liable, even if the officers are not individually named as defendants (like Officer Carnes) and even if these officers are entitled to qualified immunity (like Esslinger and Rush).  *See Cordova v. Aragon,* 569 F.3d 1183, 1193–94 (10th Cir. 2009).  Moreover, "qualified immunity analysis does not apply to municipalities."  *Id.* at 1193.

While Brandt and Westminster have filed cross-motions regarding municipal liability under *Monell*, the Court finds that a genuine factual dispute remains as to whether a municipal policy or custom was or was not the "moving force" behind the

actions taken by Westminster's employees allegedly in violation of Brandt's rights.

Brand has two theories of municipal liability.  First, he argues that the very existence of Section 6-2-1(A)(1) demonstrates a municipal policy of criminalizing speech protected by the First Amendment.  Having rejected Brandt's facial challenges to the Ordinance, the Court must also reject this theory of municipal liability, since the Ordinance is not, in fact, unconstitutional on its face.

Second, Brandt argues that Westminster "has a policy practice or custom of criminalizing Mr. Brandt's protected speech and violating his First Amendment rights," also phrasing this as "a demonstrable custom, pattern, and practice of arresting [Brandt] for engaging in First Amendment activity."  (ECF No. 37 at 10, 23.)  In support, he points to numerous instances in which he has been cited or arrested by WPD in connection with what he claims was protected speech (specifically, twenty-four times, according to Brandt's own count).  (*See* ECF No. 37-5 at 24.)  The evidence also reflects that Brandt was known (directly or indirectly) to Esslinger, Rush, and Carnes, based on his regular practice of displaying his "fuck cops" sign(s) around Westminster. The audio recording of the dispatch caller who fielded citizen complaints on June 6, 2014 also reflects that Brandt was well known to WPD.  Indeed the dispatch employee stated WPD is "always very aware of what [Brandt] is doing and when, and agreed with one caller that "unfortunately" although Brandt's sign and conduct were "offensive both to us [*i.e.* WPD] and . . . [to] everyone else in the area," that "it's his freedom."  (*See* ECF No. 38 at ~00:06–2:55.)  Likewise, the written records refer to Brandt by his first name and include notes such a "Eric is out again w/his sign."  (ECF No. 43-3 at 1.)

The Court finds that a reasonable jury could infer from this evidence, taken as a

whole, that the actions taken against Brandt on June 6, 2014 were consistent with a municipal custom, policy or practice of citing, arresting, or harassing Brandt individually, and that such a custom or policy was the "moving force" behind any actions constituting constitutional violations. *See generally Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (noting a municipal policy or custom may be established in a variety of ways, including "a widespread practice that, although not authorized . . . . is so . . . well settled as to constitute a custom or usage . . . ," "failure to adequately train or supervise," or "ratification by . . . final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated").

However, the Court also concludes that a reasonable jury could also agree with Westminster that it did *not* have any policy targeting Brandt, and that each instance in which he has been contacted, charged or arrested by WPD had a reasonable and legitimate law enforcement basis. A jury might also credit the evidence, including the testimony of Sergeant Esslinger and Officer Rush, tending to show that while WPD officers are well aware of Brandt, his conduct, and his First Amendment advocacy, they have been directed to treat him "just like every other citizen." (*See* ECF No. 37-2 at 6; *see also* ECF No. 37-1 at 6.) A jury crediting this evidence could thereby reject Plaintiff's municipal liability claim(s). Therefore neither party is entitled to summary judgment on this claim, and the factual question regarding an alleged policy or custom targeting Brandt will remain for trial, to the extent his theories of liability are otherwise viable.

    2.    Fourth Amendment Claim

Defendants argue that Brandt cannot establish any Fourth Amendment violation,

because Sergeant Esslinger and Officer Rush's conduct in detaining him did not constitute an unreasonable search or seizure. (ECF No. 39 at 6–11.) Specifically, Defendants argue that Esslinger and Rush "had reasonable suspicion to warrant an investigatory stop [of Brandt"] (ECF No. 39 at 8), and that any detention of Brandt was "justified at its inception . . . limited in length . . and reasonable" (*id.* at 11).

Brandt responds that his Fourth Amendment rights were violated because he was "seized, or arrested," and "even subjected to a nonconsensual pat-down search," without probable cause to justify this seizure. (ECF No. 43 at 15.) Further, Brandt maintains that "[t]he sole basis for arresting Mr. Brandt was his display of his 'Fuck Cops' sign . . . which offended a number of . . . citizens," and that "First Amendment-protected activity cannot form the basis for probable cause." (*Id.* at 16.)

The Fourth Amendment, applicable to the states through the Fourteenth Amendment's Due Process Clause, provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. A seizure occurs for Fourth Amendment purposes when "a reasonable person would have believed that he was not free to leave." *Michigan v. Chesternut*, 486 U.S. 567, 573 (1988). "The Supreme Court has identified three types of police/citizen encounters: consensual encounters, investigative stops, and arrests." *Oliver*, 209 F.3d at 1186.

> Consensual encounters are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing. An officer is free to approach people and ask questions without violating the Fourth Amendment. However, the person approached under these circumstances is free to refuse to answer questions and to end the encounter.

27

On the opposite extreme are arrests, which are characterized by highly intrusive or lengthy search or detention. An officer may make an arrest without a warrant if the officer has probable cause to believe a crime has been committed by the arrestee. Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.

An investigative detention, which is also referred to as a *Terry* stop, is a seizure within the meaning of the Fourth Amendment, but unlike an arrest, it need not be supported by probable cause. The police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause. Based on the totality of the circumstances, the detaining officer must have a particularized and objective basis for suspecting the particular person stopped of criminal activity. When the officer has stopped a person based on reasonable suspicion of criminal activity, the officer may briefly detain the individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information.

*Id.* at 1186 (internal quotation marks and citations omitted; paragraph break added for clarity; other alterations incorporated)

While Plaintiff characterizes his detention as a warrantless arrest, not supported by probable cause (*see* ECF No. 43 at 14–22), Defendants, characterize his interaction with Esslinger and Rush as an investigatory stop adequately supported by "reasonable suspicion," and therefore a reasonable seizure within controlling Fourth Amendment law. While Defendants concede that Brandt was not free to leave during this interaction, they argue that the resulting seizure was "justified at its inception, extremely limited in length of time and reasonable." (ECF No. 39 at 11.)

The Court agrees with Defendants that on the undisputed facts, Brandt cannot

establish a Fourth Amendment violation by showing an unreasonable seizure, and therefore summary judgment is warranted against this claim. Even viewing all evidence in the light most favorable to Brandt, the record establishes that Officers Esslinger and Rush had reasonable suspicion to investigate whether Brandt was engaged in criminal activity, including the possibility that he had been yelling at passersby in a manner criminalized by Westminster and *not* protected by the First Amendment (*i.e.*, that Brandt had been using "fighting words").

Brandt's counter-argument is primarily that there was never probable cause to detain him. (ECF No. 43 at 14–22.) This argument misses the mark because the Court finds the controlling question is not whether there was probable cause, but whether there was reasonable suspicion to justify an investigatory stop, and whether that stop remained reasonable. The Court finds that there was, and thus the nature of the seizure which occurred was not unreasonable, as a matter of law. Initially, there seems no basis to claim that Brandt's constitutional rights were violated as soon as WPD dispatched officers based on citizen complaints, an action which might have led only to a consensual encounter. "An officer is free to approach people and ask questions without violating the Fourth Amendment." *Oliver*, 209 F.3d at 1186. Given the citizen complaints of Brandt's behavior, the Court concludes that Esslinger and Rush's dispatch and initial contact with Brandt was justified at its inception.

Beyond that, the question is whether the interaction with Sergeant Esslinger and Officer Rush while Officer Carnes was investigating whether Brandt had violated any law was unreasonable. The Court concludes it was not. Although a pat-down search was conducted of Brandt, it is well-established that officers may do so as a safety

precaution, even assuming Brandt did not consent.  *See, e.g. United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007).[6]  Further, Brandt himself characterizes his interaction with Esslinger as "cordial," and "nonconfrontational," and it is undisputed that Rush played a mostly-silent backup role, hardly speaking with Brandt until he served him the summons.  (*See* ECF No. 37-5 at 11, 12–13, ; ECF No. 37-1 at 4.)  Thus there is no indication of improper intimidation, coercion, or harsh treatment.

Finally, while in other circumstances a stop of approximately 30 minutes would be near the outer temporal limits permissible for a *Terry* stop, here the record reflects that a substantial portion of that time occurred *after* Brandt had been informed that he would be arrested, and while he then "pleaded" (in his own words) to instead be issued a summons.  (ECF No. 37-5 at 13.)  Esslinger and Rush eventually agreed to this request, after which Brandt, again in his own words, "boldly carried [his] sign down the street to [his] house."  (*Id.* at 16.)  Brandt's own characterization is that the interaction before he was told he would be arrested lasted only about 15 minutes, during which time Officer Carnes was offsite speaking with multiple complaining witnesses, investigating whether any crime had been committed.  (ECF No. 37-5 at 14; ECF No. 39 at 5, ¶ 10.)

Given this timeframe, the fact that Brandt was never physically restrained, and the fact that, although he was subject to arrest, Brandt was ultimately allowed to walk home on his own, the Court finds that the relevant Fourth Amendment seizure

---

[6] The record reflects a factual dispute as to whether Sergeant Esslinger or Officer Rush conducted the pat-down, and a possible dispute as to whether Brandt consented to the pat-down.  (*See* ECF No. 37-5 at 11; ECF No. 37-2 at 8.)  However, even assuming these disputes are genuine, they would not alter the Court's resolution of the present issues.

amounted to an investigatory stop, and remained reasonable for Fourth Amendment purposes as a matter of law. Brandt, focusing his arguments on the lack of probable cause, does not argue that Defendants lacked reasonable suspicion to justify the investigatory stop, and his primary argument regarding its unreasonableness is addressed to its temporal length and the fact that he was not free to leave. As analyzed above, the Court finds these arguments unpersuasive and will grant Defendants' Motion for summary judgment against this claim.

      3.    <u>Malicious Prosecution</u>

In the Tenth Circuit, "a § 1983 malicious prosecution claim includes the following elements: (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).

Defendants argue, among other things, that Plaintiff cannot prove the second element, because although Brandt's disorderly conduct citation was dismissed, that dismissal was without prejudice and subject to refiling. (*See* ECF No. 39 at 14.) They cite *M.G. v. Young*, 826 F.3d 1259, 1262 (10th Cir. 2016), where the Tenth Circuit held that "[t]o satisfy the second element . . . the plaintiff must show . . . that the criminal proceedings were dismissed for reasons indicative of innocence, and not because of an agreement of compromise, an extension of clemency, or technical grounds having little or no relation to the accused's guilt." Therefore, "[w]here the case is disposed of in a manner that leaves the question of the accused's innocence unresolved, there

generally can be no malicious prosecution claim by the accused," *id.* (internal quotation marks omitted), and "even where criminal charges were unambiguously dismissed by the criminal court, a malicious-prosecution plaintiff still bears the burden of demonstrating that the dismissal was indicative of innocence," *id.* (citing *Cordova v. City of Albuquerque*, 816 F.3d 645, 651–55 (10th Cir. 2016)).  To determine if a plaintiff has met this burden, the Court "look[s] to the stated reasons for the dismissal of the criminal proceedings as well as the circumstances surrounding it."  *M.G.*, 826 F.3d at 1263.

Brandt claims, incorrectly, that Defendants conceded any argument on this element of his malicious prosecution claim, and thus does not respond to Defendants' argument.  (*See* ECF No. 43 at 29.)  In any event, Brandt has no evidence to carry his burden of showing the disorderly conduct prosecution was dismissed in a manner "indicative of innocence."  (*See* ECF No. 43 at 29–30.)[7]  Defendants are therefore also entitled to summary judgment against Brandt's malicious prosecution claim.

4. <u>First Amendment Retaliation Claim</u>

To prevail on a First Amendment retaliation claim, Brandt must establish: (1) that he engaged in constitutionally protected activity, (2) that the defendant's actions caused

---

[7] In the Final Pretrial Order—but nowhere in the summary judgment briefing—Brandt alleges that the disorderly conduct case against him "was dismissed by the municipal court upon motion of counsel for Mr. Brandt on December 17, 2014, after a jury trial had commenced, a jury was empaneled, and the City presented its case in chief."  (ECF No. 57 at 4.)  This claim still fails to identify the basis for dismissal or show it was indicative of innocence, and Brandt has admitted the dismissal was without prejudice and subject to refiling.  (ECF No. 43 at 6, ¶ 19.)  In any event, Brandt's more specific allegation is unsupported by any citation to evidentiary materials in the record which could defeat summary judgment.  *See* Fed. R. Civ. P. 56(c)(1); *Cross v. The Home Depot*, 390 F.3d 1283, 1290 (10th Cir. 2004) ("[O]n a motion for summary judgment, it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without depending on the trial court to conduct its own search of the record." (internal quotation marks omitted)).

plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) that the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct. *Perez v. Ellington*, 421 F.3d 1128, 1132 (10th Cir. 2005)*; Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). Defendants argue, in cursory fashion, that Plaintiff cannot prove any of these elements and that they are entitled to qualified immunity against this claim.

Viewing the evidence in the light most favorable to Brandt, while Esslinger and Rush are individually entitled to qualified immunity, a reasonable jury could find that Brandt has proven all the necessary elements of this claim, including the elements needed to establish municipal liability under *Monell.*

Defendants first argue that "there is no evidence that Rush or Esslinger contacted [Brandt] because of his participation in any constitutionally protected activity," and that Plaintiff therefore cannot meet the first element of his claim. (ECF No. 39 at 12.) This argument is misdirected, and confuses the first and third elements of the claim, at least as to a claim directed at Westminster, rather than at Rush and Esslinger individually. The question is whether Brandt was engaged in constitutionally protected activity, and there seems little dispute that at least part of Brandt's activity—both on June 6, 2014 and before—amounted to engaging in free speech, regarding topics of public concern, and within public fora. Moreover, Brandt has evidence from which the trier of fact could conclude that Westminster, and in particular officers and employees of WPD, knew that Brandt's anti-police sign and speech were protected expression under the First Amendment. At a minimum, the evidence is sufficient to defeat

summary judgment on the question of whether Brandt was engaged in constitutionally protected speech on and/or before June 6, 2014.

As to the second element, whether Defendants caused Brandt to suffer an injury likely to chill the protected speech activities of "a person of ordinary firmness," Defendants argue that Esslinger and Rush "issued a citation because of [Brandt's] conduct toward public citizens and the reasonable belief that [Brand's] conduct was unlawful," and that Brandt therefore cannot sustain his claim on this element. Defendants' argument confuses the question of *why* Brandt was cited with the distinct question of whether the citation caused him an injury consistent with "chilling" protected speech or expression. The issue on this element is whether Defendants caused an injury to Brandt, and whether it was of a type that would "chill" or deter an ordinary person from future constitutionally-protected expression. It is undisputed that Brandt was charged with a crime, faced a fine or jail time, and spent some months defending against that citation before it was ultimately dismissed. A reasonable jury could find this sufficient to deter an ordinary person from expressing themselves in the future.

Lastly, Defendants argue that "the undisputed evidence establishes that the officers acted based on Plaintiff's behavior and probable cause established by [Officer Carnes]," and were *not* motivated in response to Brandt's protected speech. (ECF No. 39 at 13.) Here, as with the evidence that could support Brandt's required showing of a municipal policy or custom, a reasonable jury could infer from Brandt's past history with the City of Westminster, and with WPD and even Sergeant Esslinger in particular, that WPD's conduct towards Brandt was, in fact, motivated as a response to Brandt's display of his "Fuck cops" sign, on this particular day and/or in the past. Further,

because a jury might agree with Brandt that the citizen reports regarding his conduct amounted to no more than complaining of "offensive" or "crude" speech, well short of punishable "fighting words," the jury could also agree with Brandt that Officer Carnes's determination of probable cause for a violation of Section 6-2-1(A)(1) was unfounded or pretextual, permitting a reasonable inference that Carnes, and perhaps other members of the WPD, did in fact seek to retaliate against Brandt and his "Fuck cops" message. More generally, the Court strongly disfavors granting summary judgment on issues of motive or intent. *See Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995) ("It is not the purpose of a motion for summary judgment to force the judge to conduct a 'mini trial' to determine the defendant's true state of mind. * * * Judgments about intent are best left for trial and are within the province of the jury."); *Romero v. Union Pac. R.R.*, 615 F.2d 1303, 1309 (10th Cir. 1980) (issues of "intent and motive" are "particularly inappropriate for summary judgment disposition").

Because a reasonable jury could find for Brandt on all elements of this claim, and might also conclude that the actions of Officer Carnes, and/or other Westminster employees were animated by a municipal policy or custom to charge or harass Brandt, summary judgment is inappropriate against this claim.[8]

5.  <u>As-Applied First Amendment Claim</u>

Brandt has also pled a claim under § 1983 for violation of his First Amendment right to free speech, which his present briefing also characterizes as an as-applied First

---

[8] Brandt does not affirmatively seek summary judgment in his favor on his Fourth Amendment, malicious prosecution, or First Amendment retaliation claims.  (See ECF No. 37 at 24.)

Amendment claim.  (ECF No. 1 ¶¶ 42–56; ECF No. 50 at 6.)   Both parties move for summary judgment in their favor on this claim.

        a.    *Treatment Separate from Retaliation Claim*

Initially, Defendants argue that Brandt's First Amendment claims "constitut[e] a single claim for retaliatory arrest," and that Brandt "cannot sustain a separate claim for violation of free speech."  (ECF No. 47 at 9.)  Relying on *Ramos v. Carbajal*, 508 F. Supp.2d 905 (D. N.M. 2007), Defendants argue that the act of detaining Brandt, allegedly in response to his speech, "falls squarely within the retaliatory arrest framework—not a . . . restriction of First Amendment rights regarding speech."  (ECF No. 47 at 9.)

In *Ramos*, a police officer removed the plaintiff from an election location based solely on allegations made by the county clerk that plaintiff had been harassing and intimidating election workers.  *See* 508 F. Supp.2d at 908–09.  The plaintiff sued alleging retaliation and a First Amendment violation.  *Id.* at 916.  The district court, noting that plaintiff had "framed the First Amendment portion of his Complaint as a violation of his right to political association," *id.* at 916, observed that the court "can imagine other rights that might be implicated," but that plaintiff "ha[d] not alleged violations of any of these rights," and therefore confined its analysis to whether the police officer "violated [the plaintiff's] right, as a private citizen, to political association," *id.* at 916.

The plaintiff maintained that his first amendment infringement claim was not a retaliation claim, and not subject to the three-part test articulated in *Per*ez, *supra*, but

the plaintiff "did not . . . indicate what test *is* applicable . . . or articulate the elements of the First Amendment claim he alleges."  *Id.*  Moreover, the plaintiff did not "point out any preemptively proscriptive action in which [the police] . . . . engaged to deprive him of his First Amendment rights."  *Id.*  "Absent this showing," the court found itself "uncertain how it could analyze [plaintiff's] claim as anything but a claim for retaliation, going on to find the officer was entitled to qualified immunity against that single claim.  *Id.*

The Court finds *Ramos* distinguishable, and inadequate to establish that Westminster is "entitled to judgment as a matter of law" against Brandt's as-applied First Amendment claim.  Fed. R. Civ. P. 56(a).  Brandt has explicitly pled two separate claims: first, for an as-applied direct violation of his First Amendment right to free speech, and second, for retaliation motivated by his protected speech.  Unlike the single, and evidently somewhat muddled claim asserted in *Ramos*, and unlike the plaintiff's failure there to articulate the applicable test and elements, Brandt here clearly articulates two parallel claims.  While they are certainly closely related, and even if Brandt's retaliation claim may be a better fit to the facts, the Court cannot summarily determine that Brandt's as-applied First Amendment claim is not cognizable or must fail as a matter of law.

b.  *Genuine Issues of Fact Remain*

As with Brandt's retaliation claim, a reasonable jury could find in his favor on his as-applied First Amendment challenge.  It is undisputed that Brandt was speaking in a public forum, specifically a sidewalk, and in relation to an issue of public concern.  Moreover, viewing the evidence in the light most favorable to Brandt, a reasonable jury

could agree that the witness reports regarding his speech fell short of showing any criminal conduct, reflecting only that a handful of citizens complained to the police because they were"offended" or "disgusted." Because a jury could therefore agree with Brandt that the "issuance of a citation and summons . . . [was] a content-based or view-point-based restriction on speech," and thereby a "denial of his right to free speech" (ECF No. 1 ¶¶ 45–46), Defendants are not entitled to summary judgment against this claim.

However, even assuming that Officer Carnes or other Westminster employees violated Brandt's First Amendment rights, a reasonable jury could also agree with Westminster that this was not done pursuant to any municipal policy or custom. Therefore, given that Defendants Esslinger and Rush are entitled to qualified immunity, Brandt is also not entitled to summary judgment in favor of this claim. The Court therefore need not address whether a genuine factual dispute remains as to any other material issue or element of this claim.

## IV. CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.  Defendants' Combined Motion for Summary Judgment (ECF No. 39) is GRANTED IN PART as follows:

    a.  Summary Judgment is GRANTED against all of Plaintiff's claims as to Defendants Charles Rush and Ray Esslinger;

    b.  Summary Judgment is DENIED as to Plaintiff's First Claim for Relief under § 1983 for a violation of his First Amendment rights, against the City of Westminster;

c.      Summary Judgment is DENIED as to Plaintiff's Second Claim for Relief under § 1983, for Retaliation for Free Speech,  against the City of Westminster;

d.      Summary Judgment is GRANTED against Plaintiff's Third Claim for Relief, seeking facial invalidation of Westminster Municipal Code § 6-2-1(A)(1) as overbroad;

e.      Summary Judgment is GRANTED against Plaintiff's Fourth Claim for Relief, seeking facial invalidation of Westminster Municipal Code § 6-2-1(A)(1) as void for vagueness;

f.      Summary Judgment is GRANTED against Plaintiff's Fifth Claim for Relief under § 1983 for an unlawful search and/or seizure in violation of his Fourth Amendment rights;

g.      Summary Judgment is GRANTED against Plaintiff's Sixth Claim for Relief under § 1983 for malicious prosecution;

2.      Plaintiff's Motion for Summary Judgment (ECF No. 37) is DENIED;

3.      This case REMAINS SET for a 5-day jury trial to commence on February 11, 2019 and a Final Trial Preparation Conference on January 25, 2019 (*see* ECF No. 62).  Given the foregoing, trial will proceed only against the City of Westminster and only on Plaintiff's First and Second claims for relief; and,

4.      The Court takes JUDICIAL NOTICE that Mr. Brandt has recently informed Chief U.S. District Judge Marcia S. Krieger that he anticipated being taken into custody on or around March 13, 2018 and expects to remain in custody "for the better

part of the next year," given a sentence in Denver and unspecified "matters pending in several other Colorado counties."  Joint Mot. for Admin. Closure, ECF No. 24, *Brandt v. Von Feldt, et al.*, Case No. 1:18-cv-0046-MSK-MEH (D. Colo. March 9, 2018).[9]  Given this representation, and the number of Mr. Brandt's other legal proceedings, the parties are hereby DIRECTED to file status reports to inform the Court of any changes to Mr. Brandt's expected availability for trial, and of any other matter arising from his other lawsuits that is likely to affect the trial or any other proceedings in this action.  Such status reports should be filed as needed promptly following any material change likely to affect this action, and in no event no less frequently than every 90 days, beginning **by no later than June 15, 2018.**

Dated this 19th day of March, 2018.

BY THE COURT:

William J. Martínez
United States District Judge

---

[9] With some consternation the Court notes that neither set of counsel bothered to advise the undersigned of these present circumstances in which Brandt finds himself.